UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 07-20103-CIV-TORRES

CONSENT CASE

TERESA LEWIS and
CLIVE LEWIS,

      Plaintiffs,

v.

JPI CORPORATION

      Defendant,

_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

      This matter came before the Court for a non-jury trial on December 1-2, 2008. Plaintiffs Teresa Lewis and Clive Lewis brought this admiralty action seeking a salvage award against the Defendant vessel, M/Y Verona De Carida ("the Vessel"), and her owner, JPI Corporation ("JPI") for services rendered on August 8-9, 2005. During and after the trial, the undersigned reviewed the evidence admitted, and considered the applicable law and arguments presented by counsel. The following findings of fact and conclusions of law are therefore made pursuant to the requirements of Rule 52 of the Federal Rules of Civil Procedure. Any findings of fact which should be treated as conclusions of law are to be treated as such, and any conclusions of law that should be treated as findings of fact should also be treated as such.

## *I. FINDINGS OF FACT*

1. Teresa and Clive Lewis are a married couple who reside at the Oceania Island Condominium Complex in Sunny Isles Beach, Florida. The condominium complex has a private marina where the Plaintiffs have kept their 52' Bayliner docked since 1999. By owning a boat, the Lewises have become familiar with boat configurations and basic mechanical operations.

2. The Vessel is a 2001 57' Carver Voyager, Official Number 1112958, Hull Identification Number CDRNA042A101. The Vessel is a high end recreational vessel with three staterooms, a salon, and a galley. The Vessel has a draft of 4'9". The Vessel is also docked at Oceania's private marina a few slips down from the Lewises' boat. JPI bought the Vessel in 2001 for $1,445,000 for the use and benefit of Naglic and Ivan Mendez-Romero ("Romero"). However, Romero is a seasonal resident at Oceania and was not in Florida at the time of the incident.

3. Around 4:30 p.m. on August 8, 2005, Mrs. Lewis was walking her dog around the Oceania Island Condominium Complex when she noticed that the Vessel was listing to the port side with the swim platform completely submerged and the attached Wave Runner partially underwater. Mrs. Lewis then called her husband who was in their condo to come down to the dock to look at the Vessel.

4. When Mr. Lewis arrived approximately five to ten minutes later, he went aboard the Vessel, heard water gushing in the engine room, opened the hatch to that compartment, and descended down the ladder. Mr. Lewis credibly testified that water level was up to his calves or knees and had filled the area between the port and

the starboard side longitudinal stringers extending from the engine room compartment to the bulkhead at approximately midship. The bulkhead separates the engine room from the accommodations. The water level had not yet risen to the engines, the generators or the fuel tanks.

5. Mr. Lewis determined that the hose from the air conditioning seawater pump to the air conditioning compressor had detached, the hose clamps were loose, and electrical power was pumping water into the Vessel from the hose. Mr. Lewis further testified that the water appeared to be flowing at the rate similar to that of a kitchen sink or garden hose.

6. Mr. Lewis then instructed Mrs. Lewis to retrieve a screwdriver from their own boat. She did so, and then Mr. Lewis proceeded to reattach the hose by tightening the clamps. Mr. Lewis testified that it took him approximately ten minutes to repair the hose and stop the influx of water.

7. Mrs. Lewis then telephoned the Water Management Group of Fort Lauderdale ("WMG") to request WMG pump the water out of the boat the next morning. Mrs. Lewis also tried to call Romero but was unsuccessful and left him several voice messages. Romero may have been in Canada at the time of the incident. Later that night, the Lewises returned to the marina on two subsequent occasions to check on the Vessel.

8. The next morning, on August 9, 2005, Mrs. Lewis met the WMG representative Mike Beresford ("Beresford") at the Vessel. The Vessel continued to list to the port side and the amount of water in the Vessel appeared to be the same as the previous evening. Beresford proceeded to turn off the shore power to the Vessel and

cut the electrical cable to the air conditioning sea water pump before deploying a submersible pump into the engine room of the Vessel. Mrs. Lewis testified that she noticed the pump was a 2,800 gallon per hour submersible pump and that it took two and a half to three hours to pump out the boat. All the while, Mrs. Lewis remained on the dock although her presence was not needed.

9. WMG charged the Lewises $100.00 for the pump out. JPI later reimbursed the Lewises, and the Lewises did not incur any other expenses in connection with this incident.

10. Approximately two months after the incident, Mr. Lewis contacted Mr. Neil MacLauren ("MacLauren"), a marine surveyor, about whether or not they had a viable salvage claim. MacLauren measured the depth of the water where the Vessel was docked and found it to be ten feet two inches (10'2"). He then took into account the tide and estimated that, at the time of the incident, the depth of the water could have been anywhere between eight (8) feet and twelve (12) feet. MacLauren opined that if the Vessel had continued to take on water, the Vessel would have settled on the bottom of the waterway, the water level would have been about five feet above the draft so that the engine room would have been completely flooded, the accommodations would have been completely destroyed, but the electronics in the pilot house would have remained in tact. MacLauren further testified that, if this had happened, then the Vessel would have been a constructive total loss with a value of $40,000 to $50,000.

11. MacLauren also speculated that the bilge pumps on the Vessel were not working as there was no reduction in the water level between the time the Lewises stopped the influx of water and the next morning when Mrs. Lewis met Beresford for

the pump out. If the bilge pumps had been working, then one would expect there to be a noticeable reduction in the water level. According to MacLauren, bilge pumps normally pump out between 500 and 1,100 gallons of water per hour; therefore, these pumps should have pumped out at least 5,000 gallons over the ten hour span between Mr. Lewis the stopping the influx of water and the next morning. This opinion is consistent with the independent survey that found that the bilge pumps in the engine room and hold aft of the engine room were inoperative at the time the survey was conducted on February 28, 2006. Based on these facts, the Court finds that it was more likely than not that the bilge pumps in the Vessel were not working or at least working at a greatly reduced capacity at the time of the incident.

12. MacLauren also testified that air conditioning pumps usually flow at a rate between 800 and 1200 gallons per hour, and when the Lewises reattached the air conditioning hose, there might have been 3,000 gallons in the Vessel.

13. On October 6, 2005, JPI listed the Vessel for sale at an asking price of $675,000.

14. On October 19, 2005, Mr. Lewis recorded a Notice of Claim Lien in the amount of $156,000 (30% of the Plaintiff's estimated post salvage value of $520,000) with the United States Coast Guard, National Vessel Documentation Center.

15. Additionally, after filing their salvage claim, Plaintiffs offered to purchase the Vessel for $300,000.

16. On January 20, 2006, the Insurer issued a Letter of Undertaking in the amount of $174,480 to serve as substitute security for the Lewises' claim in lieu of the Vessel's arrest.

17.     On October 16, 2006, the Vessel was sold on the open market at an arms length transaction for $434,000.

## II.  CONCLUSIONS OF LAW

### A.     *Salvage Claim*

The admiralty and maritime law of salvage rewards the voluntary salvor for successful rescue of life or property imperiled at sea.  *E.g., Ocean Servs. Towing & Salvage, Inc. v. Brown,* 810 F. Supp. 1258, 1262 (S.D. Fla. 1993).  The salvage award, which is unique to maritime and admiralty law, is not one of quantum meruit as compensation for work performed.  Rather, it is a bounty given on grounds of public policy to encourage the rescue of life and property imperiled at sea and to foster maritime commerce.  *See The Blackwell*, 77 U.S. (10 Wall.) 1, 19 L. Ed. 870 (1869).  A would-be salvor bears the burden of showing (1) a maritime peril from which the ship or other property could not have been rescued without the salvor's assistance; (2) a voluntary act by the salvor without a pre-existing contractual, official, or legal duty to render assistance; and (3) success in saving or helping to save at least part of the property at risk.  *E.g., Klein v. Unidentified Wreck & Abandoned Sailing Vessel*, 758 F.2d 1511, 1515 (11th Cir. 1985).

### 1. *Maritime Peril*

To determine whether a maritime peril existed, the Court examines whether, at the time the assistance was rendered, the ship was in a situation that might expose her to loss or destruction.  *Fine v. Rockwood*, 895 F. Supp. 306, 309 (S.D. Fla. 1995).  However, the danger need not be immediate or actual.  *Id*.  All that is necessary is a

reasonable apprehension of peril. *Id*. Additionally, "the likely peril is to be viewed through [the salvor's] eyes at the time he is determining whether to respond... ". *Mississippi Barge Line Co. v. Indian Towing Co.*, 232 F.2d 750, 755 n.8 (5th Cir. 1956). Courts have recognized maritime peril "where the vessel is leaking with the possibility of sinking... ". *Fine*, 895 F. Supp. at 309 (citing *The Ferm*, 258 F. 716 (S.D. Ala. 1919), *aff'd*, 268 F. 518 (5th Cir. 1920). Furthermore, this Court has found a maritime peril where a vessel was taking on water and was in danger of sinking. *The Unnamed But Identifiable Master and Crew of that Certain United States Documented Vessel Bearing Documentation No. 567135 v. That Certain Unnamed Motor Vessel Bearing Florida Registration No. FL5607*, 592 F. Supp. 1191, 1192 (S.D. Fla. 1991) (vessel found to be in peril as it was taking on water and in danger of sinking); *Flagship Marine Services, Inc. v. Belcher Towing Co.*, 761 F. Supp. 792, 795 (S.D. Fla. 1991) *reinstated by* 23 F.3d 341 (11th Cir. 1994) (tugboat with a hole in its hull and a rapid list to the port was in imminent danger of rolling over and submerging).

In this case, a maritime peril existed. When Mrs. Lewis witnessed the Vessel, it had a stern down attitude, was listing to the port side, and had its swim platform completely submerged with the attached Wave Runner sitting in the water. When Mr. Lewis climbed down into the engine room, he observed approximately 3,000 gallons of water sitting in the engine room. He then noticed a steady stream of water flowing in to the engine from a disconnected air conditioning hose, which Mr. Lewis described as similar to the rate of a kitchen sink. The Court finds that if it were not for the voluntary and swift acts of the Lewises, the Vessel would have continued to take on

water and would have continued to sink until she settled on the bottom of the waterway with the water level five feet above the draft. Therefore, the Vessel was in danger of being partially lost.

Defendant argues that the actions of the Lewises only constituted a dock side pump out, thereby, making them ineligible for a salvage award. This Court disagrees with that argument and finds the cases cited by Defendant distinguishable from our case. Defendant, for instance, cites *Fine v. Rockwood*, 895 F. Supp. at 309, as an example of a case where a sinking vessel was deemed not to be in maritime peril. While both cases involve docked vessels taking on water, *Fine* is distinguishable because the vessel in *Fine* had already settled on the channel bottom and was no longer in danger of any *further* destruction. Here, on the other hand, the Vessel had not yet settled on the bottom of the ocean floor and the Lewises were able to prevent any further destruction.

In light of the foregoing facts, the Court concludes that the Lewises have established the existence of a maritime peril from which the Vessel could not have been rescued without their assistance. Yet, the Court also concludes that the Vessel was no longer in peril after Mr. Lewis reattached the air conditioning hose and stopped the inflow of water. The salvage, once begun, continues until the salvaged vessel reaches a place of safety, which means a place where it is no longer in actual or apprehended danger. *See Sea Tow Portland/Vancouver v. Yacht High Steaks,* 2007 WL 2994502 at *4 (D. Or. 2007). The Vessel reached a place of safety once Mr. Lewis fixed the air conditioning hose and water was no longer streaming into the Vessel. Therefore, the

salvage did not include the pump-out the next morning because the Vessel was no longer in a situation exposing her to further loss or destruction.

### 2. *Voluntary Act*

In ascertaining whether services rendered by a salvor are voluntary, "the rule is that nothing short of a contract to pay a given sum for the services to be rendered, or a binding engagement to pay at all events, whether successful or unsuccessful in the enterprise, will operate as a bar to a meritorious claim for salvage. *Flagship Marine*, 761 F. Supp. at 705. *The Camanche*, 75 U.S. (8 Wall.) 448, 19 L. Ed. 397 (1869).

JPI has not presented any evidence or disputed the fact that the actions on the part of the Lewises were anything but voluntary or were the result of a pre-existing contractual, official, or legal duty to render assistance. Accordingly, the Court readily concludes that the Lewises' actions were voluntary and were provided to the Vessel in the absence of an official or legal duty.

### 3. *Success*

The Court finds that the Lewises performed a successful salvage. The actions of Mr. and Mrs. Lewis combined to stop the influx of water and prevent the Vessel from sinking any further. As both experts testified, the Vessel would have sunk further under these conditions. This would have rendered the Vessel a constructive total loss. The actions of the Lewises were successful in preventing the Vessel from sustaining further damage. They have satisfied this element by the greater weight of the evidence.

Therefore, this Court concludes that the Lewises have satisfied all the elements necessary for a valid salvage claim.

### B. *Amount of Salvage Award*

"Salvage at sea may and often does call for the performance of exciting acts of great bravery to rescue lives or property from the jaws of a near and certain doom. But it need not . . . ." *Mississippi Barge Line Co. v. Indian Towing Co.,* 232 F.2d 750, 754 (5th Cir. 1956). There is no precise formula utilized by the courts to determine a salvage award. Rather awards are established on a fact specific basis. *Biscayne Towing & Salvage, Inc. v. Kilo Alfa, Ltd.,* 2004 WL 3310573 (S.D. Fla. 2004). When determining the amount of the salvage award, a district court looks at the six *Blackwell* factors. These factors are:

> 1) the labor expended by the salvors in rendering the salvage service;
> 2) the promptitude, skill, and energy displayed in rendering the service and saving the property;
> 3) the value of the property employed by the salvors in rendering the service and the danger to which such property was exposed;
> 4) the risk incurred by the salvors in securing the property from the impending peril;
> 5) the value of the property saved; and
> 6) the degree of danger from which the property was rescued.

*The Blackwell*, 77 U.S. (10 Wall.) at 14. The method for applying these factors in order to calculate a salvor's recovery "is to use the first, second, third, fourth, and sixth factors to arrive at a percentage to be applied to the fifth factor . . . ." *Margate Shipping Co. v. M/V JA Orgeron*, 143 F.3d 976, 984 (5th Cir. 1998).

Based on *The Blackwell* factors, the Court finds this case to be a salvage of low order.

### *1. Labor Expended*

The labor expended by the Lewises was relatively minimal. Mr. Lewis spent approximately ten to fifteen minutes locating the source of the problem and reconnecting the air conditioning hose. The Plaintiffs then briefly checked on the Vessel twice later that night. Even though Mrs. Lewis dutifully waited on the dock for two and a half hours while Water Management pumped out the Vessel, not only was her presence not necessary but the Vessel was no longer in peril. The morning pump out, is therefore, not a significant factor. The most significant contributor to reducing the damage to the vessel was the work done the night before to cease the entry of water onto the boat.

At the same time it must be noted that Mr. Lewis acknowledged that had he simply turned off the shore power then that would have stopped the inflow of water since it was an electrical component causing the water to come into the boat. Therefore, this factor warrants only a slight enhancement of the award.

### *2. Promptitude, Skill, and Energy*

The Lewises are not professional salvors, and as Mr. Duke testified, they displayed no more than a "normal life skill that people would learn just through experience." The Lewises acted promptly, the Vessel was not in dire peril of sinking, and the Vessel would probably have not sunk to the bottom for several more hours. Therefore, this factor does not warrant a material enhancement of the award.

### *3. Value and Exposure to Danger of the Salvor's Property Employed*

It is undisputed that the only property used by Mr. Lewis was a flathead screwdriver. Furthermore, the Lewises were reimbursed for the $100.00 they paid to Water Management for the pump out. Accordingly, this factor does not require a material enhancement of the award.

### *4. Risk Incurred by Salvors*

The Court concludes the Lewises incurred a very low degree of risk while salvaging the Vessel. The Lewises were never in danger of the Vessel sinking while they were on board. While the Vessel was listing and water was pouring into the engine room, Mr. Lewis testified that the water in the engine room was up to his calves or knees and that all the water was contained in the bilges.

Plaintiffs argue that they were in danger of electrocution while reattaching the air conditioning hose because they were standing in water while the Vessel was connected to shore power. However, the Vessel and the shore power connection were equipped with over-current protection, and even if Mr. Lewis was at risk of being shocked he could have prevented such risk by simply unplugging the power from the dock. The exigencies of the circumstances did not require Mr. Lewis to act so immediately as to disregard his own safety. Mr. Lewis testified that at the time of the incident he was not in fear of any electrical risks because he was not thinking about that at the time but was focused on saving the Vessel. Mr. Lewis' quick actions in disregard of his own safety are certainly commendable, but they do not entitle him to an enhancement of the salvage award. Mr. Lewis knew the boat was connected to

shore power and took an unnecessary risk by jumping onto the Vessel and going down into the engine room before turning off the power. This Court cannot to increase the salvage award because Mr. Lewis took risks that more likely than not did not need to be taken. *See Hernandez v. Roberts*, 675 F. Supp. 1329, 1332 (S.D. Fla. 1988) (refusing to recognize risk that was created by the salvor's own poor judgment); *Kilo Alfa, Ltd.*, 2004 WL 3310573, at *7 (finding salvor's request for salvage award overreaching in light of the unnecessary risks taken, the value of the property saved, and the minimal peril). Accordingly, this factor does not require a significant enhancement of the award.

### 5. *Value of the Property Saved*

The salved value is the post-casualty value of the property, in her damaged state, at the time of the salvage or after the vessel is brought into safe harbor. *See Beach Salvage Corp. of Florida v. The Cap't Tom and the Tom R. Jr.*, 201 F. Supp. 479, 483 (S.D. Fla. 1961); *see generally* 3A Benedict on Admiralty at § 529. Ordinarily, the fair market value of the property determines the property value for purposes of this factor. *See Nolan v. A.H. Basse Rederiaktieselskab*, 267 F.2d 584, 588-9 (3d Cir. 1959) (noting also that the replacement cost is not the determinant of salved value); *San Francisco Bar Pilots v. The Vessel Peacock*, 733 F.2d 680, 682 (9th Cir. 1984). Use of a pre-casualty book value for the boat and subtracting estimated repair costs is a permissible method where there is no established market value for a vessel. *See San Francisco Bar Pilots,* 733 F.2d at 682*; Rand v. Lockwood,* 16 F.2d 757 (4th Cir. 1927). Where a book value is available, or a market *price* has been fixed for the boat by an

actual sale, use of the insured value of the boat would be improper. *See Peacock*, 733 F.2d at 682.

In any event, where an actual sale of the vessel has occurred after the salvage, and the sale was conducted in a commercially reasonable manner, there can be no doubt that the actual selling price is the best manifestation of the fair market value of the boat. *See, e.g., Ocean Servs.*, 810 F. Supp. at 1262.

In this case, the sale of the Vessel was conducted in a commercially reasonable manner; therefore, the selling price is the best manifestation of the fair market value. The Vessel was listed on October 6, 2005 until a sale was finally negotiated at arm's length with a closing date of October 16, 2006. The final gross purchase price was $434,000. This figure is the best indicator of the actual value of the Vessel.

Plaintiffs argue that the sale price is not an accurate valuation of the Vessel because the final date of the sale took place approximately fourteen months after the incident. Yet the Court finds from this record that the delay was more likely than not due to the Vessel being over-priced and because of questions concerning the Vessel's seaworthiness. This is reflected in the $15,000 reduction in price after completion of a survey done by the buyer that showed additional problems with the Vessel. *Hernandez v. Roberts*, 675 F. Supp. at 1332. As a whole, the record reflects that the sale price of the vessel that occurred a reasonable time thereafter and while the vessel was in materially the same condition as the time of the salvage is the best indicator of the actual value of the Vessel for valuation purposes.

### *6. The Degree of Danger from Which the Property was Rescued*

The greater weight of the evidence shows that the Vessel was rescued from a low to medium degree of danger. The Vessel was taking on a steady amount of water through the detached air conditioning sea water pump hose, the bilge pumps were not operating or were operating at a greatly reduced capacity, and the Vessel was already flooded with approximately 3,000 gallons of water. If its conditions had continued without the Lewises intervening, then the Vessel would have been partially submerged rendering the Vessel a constructive loss. However, in the realm of salvage awards, this salvage is on the lower end in the degree of danger spectrum when compared to the rescues of vessels in open water, when life and property are at stake, or when the weather is tumultuous.

Here, the Vessel was unmanned, it was docked, and the weather that day was mild. Accordingly, this factor does not require a significant increase in the salvage award. Under these circumstances, this circuit has awarded salvage awards ranging from less than 1% to up to 10% of a Vessel's post-salvage value, as contrasted with circumstances where a far greater danger to life and property existed.

For instance, in *Miami Yacht Divers*, the salvors rescued a vessel that had broken free of its moorings and was floating down the intracoastal waterway by jumping in the water, grabbing the vessel's line, and tying it up to a nearby dock. The Court concluded that there was low to moderate peril, little skill involved, and that there was no serious risk of damage to the vessel. Therefore, the Court awarded the

salvors 7.5% of the vessel's post salvage value. *See Miami Yacht Divers Inc.,* 2007 WL 2484309.

In *The Unnamed But Identifiable Motor Vessel*, the salvors came across a vessel in open waters with her engines running in reverse leaving her in danger of taking on water and sinking. The vessel had been used to transport marijuana and the crew abandoned the vessel at the sight of the plaintiffs. The salvors manned the vessel and called the Coast Guard. The Court found that the plaintiffs incurred very little risk nor did they use any special or valuable equipment and awarded the plaintiff approximately 4% of the post salvage value. *See The Unnamed But Identifiable Motor Vessel*, 592 F. Supp. at 1194.

In *Kilo Alfa Ltd.*, the Court found that the salvors saved from $100,000 in additional damages, the Vessel faced minimal peril when docked and taking on water, there was no unusual risk to the salvors, and the salvors demonstrated an ordinary skill level. Accordingly, the salvors were awarded less than 2% of the post casualty value. *See Kilo Alfa, Ltd.*, 2004 WL 3310573.

In *Triplecheck*, this Court awarded salvors 5% of the post salvage value (3% recovery rate with an additional 2% uplift due to Triplecheck's status as a professional salvor) after finding that the risk incurred by the salvors was minimal, the work involved was routine, the equipment was used worth a total of $325,000, and the operation was over a period of three days. *See Triplecheck Inc.,* 2007 WL 917276.

And in *Hernandez*, a pleasure boater boarded an unmanned vessel drifting in open water during calm conditions, called the Coast Guard, and remained with the

vessel until they arrived. The salvor was awarded less than 1% because the Court found that the vessel was in minimal danger, there were no lives at stake, the salvor exercised little skill, the value of the property employed was small, and minimal time and labor was expended. *See Hernandez v. Roberts*, 675 F. Supp. at 1332.

By contrast, in *Ocean Servs.,* a vessel in open waters was taking on water and its batteries were, as a result of the incoming water, disabled rendering the radio inoperative. The Court awarded the salvors approximately 50% of the post salvage value finding the vessel was in significant danger, the salvors acted with great alacrity, and the expensive equipment used was exposed to minimal danger. *See Ocean Servs.,* 810 F. Supp. at 1264-65.

Using these different cases as a guide, and in light of all the circumstances present in this case, based on the greater weight of the evidence, the Court concludes that Plaintiffs are entitled to a voluntary salvage award of 5% of the Vessel's sale price of $434,000. The salvage award, therefore, is $21,700. The Court is constrained to reject the amount requested by the Lewises in this case, based on the evidence cited above. The Court also rejects the amount suggested by Defendant. The Defendant's argument may be more reasonable than the Lewises, but does not completely account for the degree of danger from which the property was rescued.

The Court has also considered Defendant's position that the amount of the award should be reduced due to the Lewises' inflated salvage demand and exaggeration of work performed. Although the Court may agree that not all of Plaintiffs' claims are supported by the record, the Court does not find that those claims were made in bad

faith, at least based on this record. Accordingly, the Court declines to reduce the salvage award.

Within twenty (20) days, the parties shall file supplemental memoranda detailing the appropriate calculations for the award of prejudgment interest. The parties' memoranda are to be filed simultaneously, and no responses will be filed unless requested. If the parties agree about these calculations, they can file a joint memorandum setting forth the agreed figures and the bases underlying them.

If either party believes they are entitled to attorneys' fees following entry of these findings of fact and conclusions of law, a petition for such fees in accordance with the Local Rules of the Court shall be timely filed within thirty (30) days of this date. Any fee amount shall then be included to the total amount that shall be set forth in the final judgment.

### III.  CONCLUSION

For the foregoing reasons, it is hereby **ORDERED AND ADJUDGED** that Plaintiffs Teresa and Clive Lewis are entitled to a salvage award of $21,700 plus prejudgment interest. A final judgment will be issued pursuant to Fed. R. Civ. P. 58 after resolution of the prejudgment interest.

**DONE AND ORDERED** in Chambers at Miami, Florida this 9th day of November 2009.

       /s/  *Edwin G. Torres*
    EDWIN G. TORRES
    United States Magistrate Judge